1

2

3

4

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10                     FOR THE DISTRICT OF OREGON

11                        PORTLAND DIVISION

12
DAWN DAVINA DELAND,              )
13                              )
                  Plaintiff,    )
14                              )    No.  CV-10-744-HU
        v.                      )
15                              )
MICHAEL J. ASTRUE,              )    FINDINGS & RECOMMENDATION
16 Commissioner of Social       )
Security,                       )
17                              )
                  Defendant.    )
18                              )
                                )
19
Kimberly K. Tucker
20 Kimberly K. Tucker, Attorney at Law
11124 NE Halsey Street, PMB 675
21 Portland, Oregon 97220-2021

22      Attorney for Plaintiff

23 Amanda Marshall
UNITED STATES ATTORNEY
24 District of Oregon
Adrian L. Brown
25 ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
26 Portland, Oregon 97204-2904

27 Willy M. Le
SPECIAL ASSISTANT UNITED STATES ATTORNEY
28 Office of the General Counsel

1 - FINDINGS & RECOMMENDATION

Social Security Administration
701 Fifth Avenue, Suite 2900, M/S 221A
Seattle, Washington 98104-7075

     Attorneys for Defendant

HUBEL, Magistrate Judge:

     Plaintiff Dawn D. DeLand brings this action for judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act (SSA).  This Court has jurisdiction under 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)).  For the reasons below, I recommend that the Commissioner's decision be affirmed.

                    PROCEDURAL BACKGROUND

     Plaintiff protectively applied for SSI and DIB on May 26, 2004, alleging an onset date of December 31, 2001.  Tr. 12, 64-66, 75-78.  Her applications were denied initially and on reconsideration.  Tr. 12, 52-54, 56-60.  On December 5, 2007, plaintiff appeared for a hearing before an Administrative Law Judge (ALJ).  Tr. 12, 599-635.  On February 8, 2008, the ALJ found plaintiff not disabled.  Tr. 9-20.  On April 30, 2010, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the agency's final decision.  Tr. 4-6.

                      FACTUAL BACKGROUND

     Plaintiff alleges disability based on leg vein disorder in both legs, bipolar disorder, and post traumatic stress disorder (PTSD).  Tr. 79.  At the time of the hearing, plaintiff was 44

2 - FINDINGS & RECOMMENDATION

years old.[1]  Tr. 603.  Plaintiff has a high school education and
some college, including a certificate in juvenile probation.  Tr.
19, 86, 603.  She has past relevant work as a cocktail waitress.
Tr. 19.

I.  Medical Evidence

     The medical evidence begins on June 15, 2000, when plaintiff
sought treatment for pain in her legs.  Tr. 372-74.  Later that
year, on October 24, 2000, plaintiff had ultrasound-guided
sclerotherapy for the left greater saphenous vein.  Tr. 370.

     On October 9, 2001, plaintiff had ultrasound-guided
sclerotherapy of a left leg varicose vein, and tolerated the
procedure well, leaving in an ambulatory, stable condition.  Tr.
365. By May 1, 2002, plaintiff reported that her legs felt great
and she did not need any further treatment.  Tr. 362.

     On July 9, 2003, plaintiff was evaluated at the Arrowhead
Regional Medical Center in Colton, California, after her boyfriend
called the police because she was suicidal and expressing paranoid
delusions.  Tr. 167.  She was placed "on a 5150" by the police as
a danger to herself and brought in to the hospital for evaluation.
Id.  When asked why she was at the hospital, plaintiff stated that
"I was in the process of going to detox from crystal
methamphetamine, I stopped my meds and put myself in a bad
situation."  Id.  Plaintiff believed that someone in her building

_____

     [1]  The ALJ's opinion notes that plaintiff was 38 years old
at the time of the disability onset date, but makes no mention of
her age at the time of the decision.  Tr. 19.  This is harmless
error because the ALJ correctly noted plaintiff's age during the
hearing (Tr. 603) and properly classified plaintiff as a "younger
individual, age 18-49," in his opinion (Tr. 19).

3 - FINDINGS & RECOMMENDATION

1  was trying to film her and people were out to hurt her.  Tr. 171.
2  She had been unable to sleep for five days, and felt generally
3  tearful, guarded, and paranoid.  Id.  She had difficulty giving a
4  clear story about what brought her to the hospital, and tested
5  positive for amphetamine, methamphetamine, phenylpropanolamine,
6  ephedrine, and pseudoephedrine.  Tr. 171, 183.  Plaintiff reported
7  that she has been using methamphetamine since the age of 16, but
8  denied any alcohol abuse.  Id.  She was assessed with a global
9  assessment of functioning (GAF) score of 25, and as suffering from
10 polysubstance abuse history and psychotic disorder, not otherwise
11 specified.  Tr. 168.  Plaintiff reported being previously diagnosed
12 with bipolar disorder, for which she was currently receiving
13 services, but that this was her first inpatient hospitalization.
14 Tr. 168, 171.  She had a rash on her arms and waist, reported
15 problems with varicose veins and restless leg syndrome, but
16 otherwise had a "grossly normal physical examination."  Tr. 175-78.
17 Plaintiff was discharged on July 11, 2003, with Effexor and Zyprexa
18 medications.  Tr. 174.

19      The next treatment record is not until April 14, 2004, when
20 plaintiff began outpatient mental health treatment at Cascadia
21 Behavioral Healthcare in Portland.  Tr. 297-98.  At that time,
22 plaintiff stated that she had recently moved to Portland from
23 California in order to leave a violent situation with her ex-
24 boyfriend and husband.  Tr. 297.  She reported a history of
25 methamphetamine and cocaine use, noting that she used frequently
26 when she was in her late 20s but stopped to attend school.  Tr.
27 294.  She did not mention her earlier report that she had been
28 using methamphetamine since she was 16 years old.  Plaintiff also

4 - FINDINGS & RECOMMENDATION

did not mention that she tested positive for methamphetamine in July 2003, instead stating that she had been clean for seven years, except for a relapse three months ago, which would have been in early 2004. Id. She only occasionally drinks alcohol, usually beer or wine. Id. Plaintiff reported that she had been diagnosed with bipolar disorder and that prior to moving to Portland, her most recent medication regime had been working well to stabilize her symptoms, but since moving to Portland, she has been off her medication. Tr. 292, 294, 297. Her reported symptoms include racing thoughts, poor concentration, irritability, poor impulse control, mood disregulation, paranoia, and anxiety. Tr. 292. She was currently living alone in a studio apartment paid for by money she received when her stepfather passed away. Tr. 292.

Plaintiff transferred to Cascadia's downtown clinic on April 29, 2004, and began seeing Nicole Gulick, M.A. Tr. 288. During her initial visit, plaintiff was nervous, scared, and anxious. Id. Plaintiff expressed that she thought she was being followed by her ex-boyfriend. Id. Plaintiff noted her history of drug use, stating that she last used one month ago. Id. Plaintiff arrived 45 minutes late for her next appointment, stating that she had lost track of what day it was and was distressed and embarrassed about having to miss the appointment. Tr. 286. Gulick observed that plaintiff was talking fast and appeared anxious. Id.

Gulick next saw plaintiff on May 13, 2004, at which time plaintiff expressed enthusiasm about her domestic violence survivor support group. Tr. 285. Plaintiff's speech was pressured, she displayed a lot of energy, and she was less fearful of her ex-boyfriend than she was at their first meeting. Tr. 285.

5 - FINDINGS & RECOMMENDATION

On May 18, 2004, plaintiff saw Gary Leno, a psychiatric mental health nurse practitioner (PMHNP), at Cascadia for medication management. Tr. 284. At that time, plaintiff admitted her history of methamphetamine use but denied any "recent," use, stating that her last use was three months prior. Tr. 284. Plaintiff complained of feeling "too slowed down," but seemed energized. Id. She reported that she thought someone, probably her ex-boyfriend, was following her. Id. Leno assessed her as suffering from bipolar disorder and likely PTSD, with a history of polysubstance abuse in early remission. Id.

During her next several appointments with Gulick, plaintiff's thoughts and speech were less rapid and more focused. Tr. 280-83. She did not show for her appointment on June 25, 2004, but called a few days later to reschedule. Tr. 278-79.

On July 8, 2004, plaintiff saw Susan Hippe, PMHNP, for medication management. Tr. 277. Plaintiff reported feeling more comfortable seeing a female PMHNP for her medication needs. Id. She reported a 10-year history of bipolar disorder, and was currently taking Seroquel and Eskalith. Id. Hippe observed that plaintiff was restless, her affect animated, her speech rapid, and her mood depressed but agitated. Id. Consequently, Hippe assessed her as bipolar (hypomanic). Id. She also noted plaintiff's history of cocaine and methamphetamine abuse, with her last reported use of methamphetamine being four months ago. Id.

At plaintiff's appointment with Gulick on July 8, 2004, plaintiff expressed that she is not ready to work with people yet because she "sees into things that are not really there," such as thinking that people are following her when they really are not.

6 - FINDINGS & RECOMMENDATION

1 Tr. 276.  By her next appointment on July 22, 2004, plaintiff
2 reported that she could tell the difference between reality and
3 non-reality.  Tr. 275.  Gulick observed that plaintiff's speech was
4 less pressured and she was looking forward to working, especially
5 if she could find a landscaping job.  Id.

6      On August 10, 2004, plaintiff reported that her medications
7 were helping her to calm down, but she was still unsure of working
8 around people because of her PTSD and manic phases.  Tr. 272.
9 Gulick observed that plaintiff's thoughts were more goal oriented
10 and her speech had slowed down from their previous meetings.  Id.

11      During a medication management meeting with Hippe on August
12 19, 2004, plaintiff's affect was distressed, her mood congruent,
13 her speech very rapid and difficult to interrupt, and she was late
14 for her appointment because she had mistaken the time.  Tr. 271.
15 Plaintiff reported that the Seroquel really helps her sleep, but
16 she had recently spilled the pills in her purse so she used a
17 Valium instead.  Id.

18      Plaintiff missed her next appointment with Gulick, scheduled
19 for September 17, 2004.  Tr. 270.  During their next appointment on
20 September 30, 2004, plaintiff discussed a recent stressful trip to
21 California, her desire to be independent, and her excitement about
22 starting her job at Well Springs.  Tr. 268.

23      On October 2, 2004, clinical psychologist Gary Sacks, Ph.D.,
24 performed a psychodiagnostic examination of plaintiff as part of
25 her examination for Oregon Health Plan eligibility.  Tr. 185-88.
26 Plaintiff's chief complaint was that she is bipolar, and as a
27 result, she is anxious in public and finds it "hard to work with
28 people."  Tr. 185.  During the one-hour interview, plaintiff's

7 - FINDINGS & RECOMMENDATION

1  speech was pressured and she alternatively sobbed and appeared
2  exceedingly happy. Tr. 186. Dr. Sacks noted that plaintiff's
3  responses were tangential, she required frequent redirection and
4  appeared hypomanic, but she reflected intact cognitive functioning,
5  and was alert, oriented, and appeared in good reality contact. Id.
6  Plaintiff described delusions during past bouts of methamphetamine
7  use. Id. Plaintiff was currently taking Lithium and Seroquel, and
8  had been diagnosed with bipolar disorder and amphetamine
9  dependance. Tr. 187. She reported that she last used
10 methamphetamine in early 2004. Id. Plaintiff noted that she had
11 been psychiatrically hospitalized for three days at the Arrowhead
12 Regional Hospital in late 2003, acknowledged the she had been using
13 methamphetamine at the time, but could not report the circumstances
14 surrounding her hospitalization. Id. Plaintiff reported that she
15 suffers nightmares and intrusive daytime recollections of trauma
16 because of physical abuse by her ex-husband. Tr. 186-187.
17 Plaintiff reported feeling estranged from others, that she has
18 difficulty trusting men, has a foreshortened sense of the future,
19 avoids conversations, events, people, and places that remind her of
20 past trauma, and suffers emotional and physiologic reactivity when
21 she comes into contact with unknown men. Tr. 187-88. Plaintiff
22 stated that she has been sober for eight months, but that she used
23 methamphetamine regularly for the two years prior. Tr. 188.
24 During the 1980's, plaintiff used cocaine but during the 1990's she
25 was generally sober. Tr. 188. Dr. Sacks diagnosed plaintiff with
26 PTSD, amphetamine dependence in reported remission, and assigned
27 her a GAF of 50, noting that she has psychosocial stressors that
28 included unstable housing and financial strain. Id.

8 - FINDINGS & RECOMMENDATION

1     On October 8, 2004, plaintiff's mother called Gulick to
2 express her concern about plaintiff's frequent anger outbursts and
3 mood swings; Gulick made a note to speak to plaintiff about this
4 since this report was inconsistent with plaintiff's presentation
5 during Gulick's meetings with her. Tr. 267. At their next meeting
6 on October 14, 2004, plaintiff's affect was depressed, her speech
7 not as rapid and she agreed with her mother's assessment that she
8 is going through a "rough time." Tr. 266. Plaintiff also reported
9 that her ex-boyfriend may not have actually been stalking her, and
10 that it may have all just been in her mind. Id. She noted that
11 she was enjoying her job at Well Springs, where she performed
12 landscaping, apartment cleaning, and other janitorial work. Id.

13     Also on October 8, plaintiff met with Hippe for medication
14 management. Tr. 265. Hippe observed that plaintiff's affect was
15 sad but animated, her mood depressed, she was physically restless,
16 her speech rapid but coherent, and she had a tendency to suddenly
17 remember something and blurt it out while discussing another topic.
18 Id. Plaintiff also reported experiencing mood lability and
19 flashbacks of the abuse by her ex-boyfriend, likely triggered from
20 having seen him while she was in California collecting her
21 belongings. Id. Hippe opined that plaintiff's bipolar mood
22 lability might be secondary to her PTSD, and noted that plaintiff
23 is easily overwhelmed and will avoid situations that trigger her
24 symptoms. Id. Hippe continued plaintiff's Lithium and Seroquel
25 prescriptions, and restarted her on Prozac for depressed mood and
26 anxiety. Id.

27     On October 20, 2004, Paul Rethinger, Ph.D., completed a
28 psychiatric review technique form, concluding that plaintiff

9 - FINDINGS & RECOMMENDATION

suffers from PTSD and polysubstance abuse in reported remission. Tr. 208-20.  Plaintiff has no restriction of activities of daily living or episodes of decompensation of extended duration, mild difficulties in maintaining concentration, persistence, or pace, and moderate difficulties in maintaining social functioning.  Tr. 218.  That same day, Dr. Rethinger also completed a mental RFC assessment, concluding that plaintiff has only moderate limitations in the following areas: understanding, remembering, and carrying out detailed instructions; working in coordination with or in proximity to others without being distracted by them; interacting with the general public; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and setting realistic goals or making plans independently of others. Tr. 204-05.  Consequently, plaintiff would do best with a set routine, should not be required to interact closely with co-workers, and should not engage in frequent direct public contact. Tr. 206.  These assessments were affirmed by Peter LeBray, Ph.D., (Tr. 203) and reviewing medical consultant, James R. Buskirk (Tr. 221-24).

Plaintiff did not show up for her appointment with Gulick on October 28, 2004; when she called to reschedule, she said she had to miss the appointment because of work.  Tr. 263-64.  On November 9, 2004, Gulick called to check in with plaintiff, after receiving a call from plaintiff's employer, Well Springs, who reported that plaintiff was paranoid that her ex-boyfriend was involved in her paycheck being mixed up, and that she had a "difficult" day at work, prompting Well Springs to encourage her to get in touch with crisis services.  Tr. 262.  Plaintiff agreed that she had been

10 - FINDINGS & RECOMMENDATION

having some "bad" days, but felt that her medication was working and overall, she was doing okay. Id. She also mentioned that she was thankful to have her job at Well Springs. Id. Plaintiff scheduled an appointment with Gulick for November 18, 2004. Id.

On November 11, 2004, plaintiff was seen by Hippe, who noted that plaintiff's mood was improved, her concentration was good, her speech a normal volume and rate, and while she would occasionally interrupt herself and not complete a thought, her affect was full range and mood congruent, with no psychotic symptoms. Tr. 261. Plaintiff reported that was working at Well Springs about 24 hours a week, was enjoying it, and felt it was a supportive workplace. Id.

On November 15, 2004, plaintiff called Project Respond's crisis line because she believed her current boyfriend was hired by her ex-boyfriend to kill her. Tr. 260. Plaintiff was paranoid about going to work and had not been to work for a couple of days. Tr. 260-61. Plaintiff agreed to see Gulick first thing in the morning. Id. The next day, Gulick had a voicemail from plaintiff but was unable to reach her for several days. Tr. 258-59. Plaintiff missed her appointment with Gulick on November 18, but eventually rescheduled for November 24. Tr. 257-58.

On November 23, 2004, plaintiff left a message for Gulick, letting her know that she did not go to work or call in for her shift the previous night because of "PTSD symptoms." Tr. 257. The next day Gulick received several phone calls from plaintiff's mother, who had been consulting with Project Respond's crisis line because she was concerned about plaintiff's behavior, noting that she believed that plaintiff had recently slept outside one night

11 - FINDINGS & RECOMMENDATION

because she was too scared to sleep inside due to paranoia regarding her boyfriend and ex-boyfriend. Tr. 255-56. Later that day, plaintiff showed up at her mother's house and Project Respond was sent out to evaluate her. Id. The Project Respond notes indicate that plaintiff was using methamphetamine. Tr. 256.

On November 30, 2004, plaintiff arrived on time for her appointment with Gulick. Tr. 253. Her speech was rapid and her thinking paranoid and delusional regarding people in her life. Id. Gulick observed that plaintiff had limited insight that her delusions and paranoia are related to her mental health symptoms and are not real. Id. Plaintiff denied that she was taking illegal drugs. Id. During her next appointment on December 3, 2004, Gulick observed that plaintiff's speech was not as rapid and plaintiff reported she was doing better, "right now." Tr. 251. Plaintiff also expressed that she had a difficult day the previous day because she was feeling paranoid, anxious, and afraid. Id.

During plaintiff's next appointment with Gulick on December 20, 2004, plaintiff expressed that she was experiencing paranoid thoughts and making connections with things that happen in her life that are not otherwise connected, and was concerned that nobody believed her. Tr. 245. Plaintiff was able to arrange to go back to work at Well Springs. Id. The next day, Gulick received a message from plaintiff's landlord, describing a letter that plaintiff turned in to him that expressed various paranoid thoughts. Tr. 244.

On December 22, 2004, Hippe introduced Abilify into plaintiff's medication regime. Tr. 243. At her next medication management meeting on January 19, 2005, plaintiff reported that she

12 - FINDINGS & RECOMMENDATION

1  was happy with her current medications and was enjoying her on-call
2  landscaping job at Well Springs.  Tr. 238-39.  That same day,
3  Gulick observed that plaintiff's speech was not as rapid, she did
4  not report any paranoia, and stated that she had not used illegal
5  drugs for a year.  Tr. 237.

6      On January 21, 2005, Gulick completed a Mental Status Report.
7  Tr. 190-93.  Gulick reported that generally, plaintiff's appearance
8  and hygiene are good and she arrives on time to her appointments,
9  though she noted that plaintiff's disorganization sometimes makes
10 it difficult for her to make all of her appointments.  Id.  She
11 noted that plaintiff experiences paranoia and fear that can keep
12 her isolated for days at a time, makes connections with events and
13 people that are not really there, and her manic phase consists of
14 rapid  speech,  delusional  thinking,  distrust  of  others,
15 irritability,  and  disorganization.  Id.  Gulick  noted  that
16 plaintiff has no insight into her fixed delusions, but that she is
17 oriented to person, place, and time.  Id.  When she first started
18 seeing plaintiff, she showed some improvement and was able to work
19 part-time in a program for people who have mental illness, but that
20 in the last few months, plaintiff's condition has worsened, she
21 quit her job, became very paranoid, and experienced a manic phase.
22 Tr. 191.  Gulick diagnosed plaintiff with PTSD, bipolar disorder,
23 and amphetamine dependence in sustained full remission.  Id.  In
24 Gulick's opinion, plaintiff generally gets along well with others
25 but "can become irritated and angry at others relatively easy," has
26 a difficult time pausing to allow others to speak, is uncomfortable
27 around groups, strangers, or the general public, and has a very
28 limited support system, consisting of her mother and one other

13 - FINDINGS & RECOMMENDATION

1   person.  Id.  Gulick further noted that plaintiff's concentration
2   abilities are limited and she has difficulty sitting still long
3   enough to complete tasks, her mind races, and she is easily
4   distracted. Tr. 192.  Gulick also related that plaintiff had been
5   employed at Well Springs doing janitorial and landscaping work, but
6   stopped showing up to work because she thought that the signs on
7   the chalkboards in the courthouse were directed at her, and that
8   there were cameras watching her.  Id.  Despite being reassigned to
9   outside work, plaintiff was unable to continue working, stopped
10  showing up, and has only recently been able to do limited on-call
11  jobs for Well Springs. Id.

12      On February 18, 2005, Hippe completed a brief psych
13  assessment. Tr. 233-34.  After relating plaintiff's self-reported
14  history, Hippe assessed her as suffering from bipolar disorder,
15  most recently manic.  Tr. 234.  Hippe observed that plaintiff's
16  mood is stable, she retains fixed paranoid delusions, but that it
17  is possible that some of what she believes is true.  Id.
18  Plaintiff's functional status had improved since first coming to
19  the clinic in May 2004, as she was currently working part time, had
20  a stable boyfriend, was eating routinely, and denied any side
21  effects of her medications.  Tr. 234.

22      On March 7, 2005, Gulick observed that plaintiff had been
23  working regularly, had her own phone, her thoughts were goal
24  directed, and her speech was not pressured.  Tr. 232.  Gulick also
25  spoke with plaintiff's supervisor at Well Springs, who said that
26  plaintiff had been going to work and was doing well.  Id.  Gulick
27  and Hippe reported that plaintiff continued to improve and
28  stabilize throughout the spring.  Tr. 227-30, 340.

14 - FINDINGS & RECOMMENDATION

On June 8, 2005, plaintiff reported that she had recently had an incident where she became very angry and impatient and hit herself very hard on her face. Tr. 339. Plaintiff stated that this happens about once a year, and she compared it to when some people cut themselves to release tension. Id. She reported otherwise feeling good. Id.

On August 4, 2005, plaintiff saw Hippe for medication management, reporting that she had recently gone down to California to see her ex-boyfriend, and that he became violent with her, leaving bruises on her arms. Tr. 337. She left quickly, leaving some of her belongings there. Id. Plaintiff reported having some paranoia about the encounter, but was feeling better, was doing landscaping work at Well Springs, and was sleeping and eating well. Id. Hippe assessed her bipolar disorder as stable, noting that plaintiff experiences brief periods of paranoia when she is under stress. Id.

On August 26, 2005, plaintiff was seen by Gary Olbrich, M.D., to establish a relationship with a primary care physician. Tr. 585-87. On September 20, 2005, Dr. Olbrich noted that plaintiff was an hour late for her appointment, and was almost asleep on the exam table even though she only had to wait for ten minutes. Tr. 584. Plaintiff's physical examination was within normal limits, except for some mild varicosities in both lower extremities. Id. Dr. Olbrich expressed concern about plaintiff's past history of polysubstance abuse and worried that she may also have serious issues with alcohol abuse based on her presentation at the clinic. Id.

On September 13, 2005, plaintiff reported to Gulick that she

15 - FINDINGS & RECOMMENDATION

was feeling overwhelmed and depressed, with some suicidal ideation. Tr. 335.  When Gulick next saw plaintiff, on October 10, 2005, her thoughts were goal directed and her mood and appearance were good. Tr. 334.  Gulick touched base with plaintiff a few more times in late 2005, but Gulick ceased being plaintiff's treating counselor in late January 2006.  Tr. 331-35.

On February 28, 2006, plaintiff began seeing two new counselors Cascadia, Terra Marzano, MSW, and Franny Thompson, QMHP. Tr. 330.  During her first meeting with Marzano, plaintiff expressed that she felt her bipolar disorder was currently under control.  Id.  She also mentioned that she was previously in an abusive relationship, and that her ex-boyfriend has a trial coming up related to that abuse.  Id.  Plaintiff began attending the "Seeking Safety" group, in order to help handle the stress of the upcoming trial.  Tr. 328-30.

During an appointment on April 19, 2006, plaintiff reported feeling more panic and PTSD-related symptoms, causing her concern about how these symptoms are affecting her ability to follow through with everyday commitments.  Tr. 328.  She also reported that she was using alcohol to cope with her stress, though she denied any interest in harming herself or others.  Id.

On April 24, 2006, plaintiff's mother called to report that plaintiff was expressing suicidal thoughts because her boyfriend had recently broken up with her.  Tr. 324-26.  Project Respond did a welfare check that evening, and plaintiff called Marzano the next day, reporting that she was devastated by the recent breakup and had been hitting her head, leaving bruises on her face.  Tr. 324-25; 350-51.  Marzano observed that plaintiff was "below baseline,"

16 - FINDINGS & RECOMMENDATION

but safe, with no plan or intent to harm herself.  Tr. 324.

On May 2, 2006, during a medication management appointment with Susan E. Jamiel, PMHNP, plaintiff acknowledged that she had been devastated by the breakup and had experienced suicidal thoughts.  Tr. 342.  However, she reported doing much better, was no longer suicidal, and found that her group therapy was helpful. Id.  Jamiel took her off Lithium because plaintiff had reduced her dosage due to some negative side effects, but continued her Abilify and Prozac dosages.  Tr. 343.  For most of the rest of 2006, plaintiff missed some of her group meetings, expressed some distress regarding her breakup, and had some life stressors, but was stable overall.  Tr. 311-22, 344-45.

On November 15, 2006, Carlyn Glaser, QMHP at Cascadia completed an Adult Behavioral Health Assessment and Treatment Plan. Tr. 352-59.  At that time, Glaser noted that plaintiff's speech and tone were appropriate, her affect congruent, mood euthymic, thought process goal-directed, memory intact, and she was oriented to person, place, time, and circumstance.  Tr. 355.  Plaintiff was distracted, exhibited poor judgment, limited insight, and some paranoid thought content.  Id.

On December 11, 2006, plaintiff called Glaser to report that while she was in Arizona at a gun show, she was raped by a stranger in her hotel room.  Tr. 310.  She had medical treatment, spoke to rape crisis, and filed charges.  Id.  When plaintiff met with Glaser in person on December 18, 2006, she was very upset because the police and her boyfriend were not treating her kindly, causing her to feel victimized all over again. Tr. 308.  Her PTSD symptoms were exacerbated, and she was very anxious during her next several

17 - FINDINGS & RECOMMENDATION

appointments. Tr. 304-308. By February 5, 2007, plaintiff's mood was fairly stable and euthymic, though she was still experiencing life stressors which sometimes caused her some anxiety and agitation. Tr. 302-03.

Plaintiff was next seen for medication management on December 28, 2006. Tr. 348-49. At that time, Shauna Hahn, PMHNP, noted that plaintiff had not been seen for this purpose since May 2006, and wondered how plaintiff could have been taking her medications consistently with such a gap in treatment. Tr. 348. Hahn assessed plaintiff as presenting with bipolar disorder, ongoing difficulties with mood stability, underdeveloped coping skills, and a tendency to descend rapidly into crisis. Tr. 348.

On January 4, 2007, plaintiff was seen by Dr. Olbrich for follow-up medical care related to her rape. Tr. 575. Dr. Olbrich did not perform a physical examination, noting that the appointment was "basically a 25-minute counseling session." Id.

On March 26, 2007, plaintiff was seen by Hahn again for routine medication management. Tr. 346-47, 548-49. Plaintiff reported that she had not used cocaine or methamphetamine for a year. Tr. 346. Hahn restarted Prozac to help with some situational anxiety plaintiff was experiencing, noting that "it is clear that [plaintiff's] presentation has improved significantly over years on very few medications." Tr. 347.

On April 3, 2007, plaintiff began seeing Donna Hammar, FNP, instead of Dr. Olbrich, because plaintiff decided that she would be more comfortable with a female primary care provider. Tr. 573. Plaintiff came in for treatment of molloscum contagiosum, with Hammar noting that more than half of the appointment was spent "in

18 - FINDINGS & RECOMMENDATION

1  counseling and education." Id.  Plaintiff returned on April 16,
2  2007, for complaints of abdominal bloating, constipation, and
3  diarrhea, which she associated with colitis.  Tr. 575.  Plaintiff
4  also reported that these problems seemed to get worse with stress,
5  and that she was experiencing significant stress related to a
6  breakup, looking for a job, and an upcoming lineup related to her
7  recent sexual assault.  Id.  Hammar started plaintiff on Amitiza to
8  help control some of her colitis symptoms.  Id.

9      On May 14, 2007, plaintiff called Glaser, reporting that she
10 wanted to come to her group sessions but was not sure how she would
11 be able to make time since she was having difficulty finding time
12 to make it to her individual sessions.  Tr. 545.  Plaintiff was
13 still looking for a job.  Id. Glaser noted that plaintiff might not
14 be as motivated to attend therapy as she says she is.  Id.  That
15 same day, plaintiff met with Hahn for medication management, who
16 noted that plaintiff "cannot easily tolerate distress and quickly
17 decompensates into dependency."  Tr. 546.

18     On July 19, 2007, plaintiff was seen by Hahn for medication
19 management.  Tr. 540-41.  At that time, plaintiff reported feeling
20 overwhelmed by events in her life and dissatisfied that her PTSD
21 was not properly documented in her chart.  Tr. 540.  Hahn assessed
22 plaintiff as suffering from PTSD, schizoaffective disorder (bipolar
23 type), and past methamphetamine abuse.  Tr. 541.  In so finding,
24 Hahn noted that she felt that plaintiff's psychosis has been
25 underappreciated with the single bipolar diagnosis.  Id.  While the
26 precise etiology of plaintiff's psychosis was unclear, Hahn opined
27 that it could be the result of methamphetamine abuse.  Id.

28     On August 9, 2007, plaintiff admitted that she had been using

19 - FINDINGS & RECOMMENDATION

1  methamphetamine for the past three and a half months, but wanted to
2  go into in-patient treatment to get clean before she had to testify
3  at her ex-boyfriend's upcoming assault trial.  Tr. 539.  A few days
4  later, on August 13, 2007, plaintiff came in without a scheduled
5  appointment and Hahn observed that plaintiff was "much less well-
6  cared for than in previous visits."  Tr. 538.

7       On August 17, 2007, plaintiff entered a fourteen-day chemical
8  dependence treatment program at Providence Portland Medical
9  Center's Chemical Dependency Stabilization Unit. Tr. 499-525, 537.
10 At that time she was taking Abilify, Prozac, Vistaril, and Amitiza.
11 Tr. 503-04.  Plaintiff reported that she was nervous about
12 testifying at her ex-boyfriend's upcoming trial and had been using
13 about a gram a week of methamphetamine, with her last use that
14 morning. Tr. 505.  Plaintiff was admitted for "out of control use"
15 of methamphetamine and abuse of alcohol and benzodiazepines.  Tr.
16 462.  At that time, plaintiff reported drinking alcohol a couple of
17 times a week, but acknowledged that her use increases episodically
18 if she is under increased stress.  Id.  She admitted to using
19 cocaine twice during the last year, and was taking Valium more
20 frequently.  Id.  Plaintiff reported using methamphetamine daily
21 for the past four months, in order to help her cope with her rape,
22 to help manage her weight, to alleviate stomach pain from colitis,
23 and to keep her energy up. Tr. 492.  Plaintiff reported that prior
24 to her most recent relapse, she had not used methamphetamine for
25 nine years.  Tr. 462.

26      During her physical exam on August, 17, 2007, Dr. Olbrich
27 observed that plaintiff appeared alert, oriented, in no acute
28 distress, loquacious and a bit hyperactive, and "does not appear

20 - FINDINGS & RECOMMENDATION

any different than when I have seen her in the clinic over the last six to nine months." Tr. 463.  Plaintiff reported suffering from colitis which gets worse when she is not using drugs.  Id.  Dr. Olbrich observed that plaintiff was motivated to enter treatment because she wants to be "clean, sober, and look good" at the upcoming trial, and he opined that her relapse potential is very high because of her history of instability.  Tr. 464.

Plaintiff was discharged in good spirits from residential care on August, 30, 2007, with the recommendation that she engage in dual diagnosis treatment.  Tr. 433-36, 466.

Plaintiff resumed treatment with Glasser at Cascadia on September 5, 2007.  Tr. 534.  She had been clean for 22 days and was motivated to stay sober.  Id.  On September 17, 2007, plaintiff was seen at Cascadia for an alcohol and drug assessment, but one month later her file was closed because she did not come in again for treatment. Tr. 531, 533, 552-57.

On October 22, 2007, plaintiff was seen by Sandra Jones, N.D., L.A.c, at Central City Concern.  Tr. 568-69.  At that time, plaintiff was seeking medication for PTSD and bipolar disorder, since she had been "fired" from Cascadia.  Tr. 568.  She reported that she had been without her bipolar medication for at least two weeks.  Tr. 568.  Jones started her on Lamictal and gave her a referral for additional medication management and treatment.  Tr. 569.

On October 29, 2007, plaintiff was evaluated at Central City Concern by Elizabeth Cooper, PMHNP, who expressed some concern that plaintiff's primary care providers would not be able to provide the kind of care plaintiff needs, particularly in times of crisis.  Tr.

566-67.   Cooper recommended that plaintiff seek mental health services that could help with medication and case management, as well as therapy sessions.  Id.  She continued plaintiff's Lamictal prescription and added Abilify.  Id.

On November 13, 2007, plaintiff sought treatment at the DePaul Residential Treatment Center for individual counseling, physical abuse counseling, and drug treatment.   Tr. 375, 405-13. Admissions specialist Rachel Lale observed that plaintiff was nervous, self-deceptive, and possibly intoxicated.  Tr. 402, 413. She also noted plaintiff was evasive and gave inconsistent statements.  Id.  Plaintiff acknowledged that she had last used methamphetamine the previous day.  Tr. 402, 406-07.  In providing details about her drug history, plaintiff acknowledged that she had been using methamphetamine since she was 25 years old, and currently used 1/4 gram per week. Tr. 402.  Plaintiff began using cocaine at age 16, but has used only once in the previous year. Id.  She recently began taking opiate pain pills, and had used three times in the past month.  Id.  Lale expressed concerns regarding plaintiff's reported drug use, namely that she is under-reporting her methamphetamine and opiate use.  Id.  Plaintiff reported racing thoughts, decreased energy, and depressed mood. Tr. 409.  She acknowledged having intrusive thoughts, but did not believe they were drug related, but instead related to past trauma and abuse by men.  Id.  Plaintiff noted that things that tend to trigger a relapse for her include weight gain, flashbacks, and emotional triggers.  Tr. 410.

Plaintiff began seeing Bonnie Toering, QMHP, at DePaul for group therapy on November 15, 2007. Tr. 401.  Toering noted that

22 - FINDINGS & RECOMMENDATION

plaintiff appeared anxious, but was an active participant in the group. Id. Plaintiff did not show for her next meeting, but did attend her first individual session on November 21, 2007. Tr. 399-400. At that time, she reported that she had not used methamphetamine since November 13, 2007. Tr. 399. Plaintiff was restless, timid, her speech pressured, and she had difficulty tracking with the conversation, leading Toering to opine that "this may [be] a result of anxiety, recent discontinued use, or a combination." Id.

On November 21, 2007, plaintiff called Toering to advise her that she was coming in to provide her UA, but noted that plaintiff "appears to be anxious regarding UA compliance." Tr. 398. Plaintiff was 35 minutes late for her UA, and missed her appointment with Toering, reporting that she did not remember having an appointment. Tr. 397.

Plaintiff met with Cooper on December 3, 2007, for medication management. Tr. 563-64. At that time, plaintiff acknowledged that the past few days had been difficult, she had been out of medication for five days, she was experiencing anxiety about her upcoming social security hearing, and she had recently relapsed and used methamphetamine and alcohol. Tr. 563. Cooper noted that plaintiff was tearful, upset, and anxious. Id. She increased plaintiff's Abilify dosage and continued her Lamictal dosage. Tr. 564.

On December 6, 2007, plaintiff called to notify Toering that she had relapsed on December 2, 2007, a few days before the anniversary of her rape in Arizona. Tr. 384-86. Toering noted that plaintiff was having difficulty balancing work, living, and

23 - FINDINGS & RECOMMENDATION

1  recovery.    Tr. 384.    After  some  encouragement  from  Toering,
2  plaintiff did attend her group therapy session that day.  Tr. 383.

3      At group therapy on December 10, 2007, plaintiff gave her new
4  "clean date" as December 4, 2007.  Tr. 381.  During her next
5  session,  plaintiff  appeared  less  anxious,  her  speech  less
6  pressured, and to be making changes in her emotional response to
7  stressors in order to strengthen her recovery process.  Tr. 380.
8  Plaintiff did not show for her next appointment or come in to give
9  a UA on December 13, despite being informed that a declined UA is
10 the same as a positive UA.  Tr. 376-79.  On December 14, 2007,
11 plaintiff reported feeling some suicidal ideation the previous day,
12 but called the crisis line, and was no longer feeling suicidal.
13 Tr. 379.

14     On January 10, 2008, plaintiff was seen by Cooper for
15 medication management, at which time her thoughts were focused on
16 her court case and her abuser, and included paranoid and delusional
17 ideation, but were otherwise clear, organized, and coherent.  Tr.
18 562.  She was distressed, tearful, angry, and her energy level
19 high.  Id.  Plaintiff was upset about her recent social security
20 hearing, expressing that she "did not want to be labeled crazy but
21 would  like  to  receive  money  for  the  difficulties  she  has
22 experienced in her life."  Id.  Plaintiff also noted that she was
23 no longer receiving therapy at DePaul, and was considering moving
24 to California.  Id.

25 II.  Plaintiff's Testimony

26     A.  Written Testimony

27     On July 13, 2004, plaintiff completed a Disability Report.
28 Tr. 79-87.  At  that  time,  she  alleged  that  she  was  bipolar,

24 - FINDINGS & RECOMMENDATION

suffered from PTSD, and had a leg vein disorder that limited her ability to work because these conditions caused her to be "out of touch with reality." Tr. 79-80. These conditions first began to bother her in 1993, but she did not become unable to work because of them until December 31, 2001. Tr. 80. Plaintiff also acknowledged that she has worked since her alleged onset date, with her most recent employment ending on October 31, 2002, because all in one week, plaintiff was robbed, her father passed away, and she was hospitalized because she was a danger to herself and others. Tr. 80.

On July 23, 2004, plaintiff completed an Adult Function Report. Tr. 97-104. At that time, plaintiff described her typical day as consisting of taking a shower, getting dressed, cleaning the house, feeding her cat, and going to her mom's house to help her clean and/or walk her dog. Tr. 97. Sometimes she has counseling appointments, but not as many as she had when she first moved to Portland. Id. She related that she used to be able to be in large crowds, but now riding on buses is hard. Tr. 98. She did not express any challenges with personal care, other than that she does not always have razors or shampoo because of financial constraints. Id. She did not express any limitations preparing meals, performing household chores, shopping, managing money, or engaging in hobbies and other interests, other than that she is limited by her finances. Tr. 99-100, 104. Plaintiff does not like groups of people, she distrusts men, and sometimes thinks she is being followed. Tr. 101-102. She has difficulty talking, hearing, seeing, understanding, following instructions, and getting along with others because her "perception is off." Tr. 102. Plaintiff

25 - FINDINGS & RECOMMENDATION

1  expressed her fear of the general public.  Tr. 103.

2       After her application was initially denied, plaintiff filled
3  out another Disability Report, on January 23, 2005.  Tr. 118-125.
4  At that time, plaintiff noted that since her last disability
5  report, her PTSD and bipolar disorder had gotten worse because of
6  a number of traumatic events.  Tr. 118.  She was experiencing more
7  frequent PTSD episodes that prevent her from taking care of her
8  daily needs.   Tr. 123.   She was currently taking Lithium,
9  fluoxetine/Prozac, Abilify, and Seroquel, but did not report any
10 side effects.  Tr. 121.

11      In February 2005, plaintiff completed an Alcohol and Drug Use
12 Questionnaire, stating that she had been clean and sober for three
13 years, that she had not used any drugs or alcohol since she became
14 disabled, other than "a couple of beers once or twice a month."
15 Tr. 139. Her longest period of sobriety lasted 12 years. Id. She
16 noted that she received drug treatment in Colton, California,
17 around August 2002.  Tr. 140.

18      After her application was denied upon reconsideration,
19 plaintiff filed out another Disability Report on June 6, 2005.  Tr.
20 156-63.  Plaintiff reported that she was having trouble with the
21 veins in her legs, but otherwise there was no change in her
22 conditions or limitations.  Tr. 156-57.  She was taking Lithium,
23 Seroquel, Abilify, and Prozac, and reported experiencing weight
24 gain and hair loss as side effects.  Tr. 159.  She was able to take
25 care of her personal needs, and was working as a janitor on an "on
26 call" basis three to five hours a week.  Tr. 160.

27      B.  Hearing Testimony

28      At the hearing on December 5, 2007, plaintiff testified that

26 - FINDINGS & RECOMMENDATION

since her alleged onset date, she did some part-time work for a
company called Well Springs, doing landscaping, apartment cleaning,
and other janitorial work.  Tr. 604, 606, 608.  When she was
landscaping, she worked in small groups of one to three people,
usually working four-hour shifts, though she might occasionally
work seven-hour shifts. Tr. 606-07.  She reported that she had to
take a few days off for mental health issues, but most of the time
she "tried to work through it."  Tr. 608-09.  After she stopped
working for Well Springs, plaintiff did some part-time housekeeping
work for approximately five months, but quit because her supervisor
was not treating her with the respect she deserved.  Tr. 607-08.

     Plaintiff testified that she had been experiencing mental
health problems for approximately ten years, when she was diagnosed
with bipolar disorder.  Tr. 610.  She testified that while she
initially worked after the diagnosis, when she began working as a
school counselor, she began to experience what she reported as "an
overwhelming amount of anxiety," which manifested in "crying and
being sensitive," and not getting along with coworkers.  Tr. 610-
12.

     At the time of the hearing, plaintiff was taking Lamictal and
Abilify, was living in a small studio apartment, and had no problem
doing household chores or grocery shopping.  Tr. 614, 616-17.  She
does not have a drivers license, so goes to the store a few times
a week, since she uses public transit to get around.  Tr. 617-18.
Her best friend lives in Washington and comes down to visit for the
day about once a month, and prior to breaking up with her
boyfriend, she would spend a couple days a week with him.  Tr. 618-
19.  She expressed having difficultly getting along with people

27 - FINDINGS & RECOMMENDATION

because she is sensitive and has anxiety. Id. She testified to having a "scattered" memory. Tr. 621. She has trouble sitting at a desk because she feels confined, can sit or stand for about an hour, and can walk for about five miles before taking a rest. Tr. 622.

Plaintiff admitted that she had a "bout with drugs" when she was about 25 years old, and had recently undergone two-weeks of inpatient treatment, approximately three weeks before the hearing, though she admitted that she "has a hard time remembering dates and times." Tr. 623-24. She had been using crystal methamphetamine for three to four months prior to entering treatment in September 2007. Tr. 624. Prior to that most recent period of drug use, which began in May 2007, she testified that she had a clean and sober period for "about a year and then there a time where I did use it once with my ex-boyfriend and another time, maybe a year and a half before that, but before that I hadn't used for eight years, almost eight years." Tr. 624-25.

In an attempt to clarify this testimony, plaintiff testified that she used in December 2005, but was sober for nearly eight years before that. Tr. 625. Plaintiff testified that she was not sure about the exact time frame, but that there was an eight or nine year period, when she was married and had stepchildren, that she did not use, try, or experiment with any drugs. Id. In 2003, she was hospitalized for suicidal behavior, and had methamphetamine in her system. Tr. 625-26.

When the ALJ questioned plaintiff about her periods of sobriety by reference to Dr. Sacks' October 2004 evaluation, plaintiff generally agreed with Dr. Sacks' characterization that

28 - FINDINGS & RECOMMENDATION

during the 1980s she used cocaine, during the 1990s she was in school and generally sober, during 2003-2003 she was using methamphetamine, and that generally, she had been "on and off" methamphetamine since moving to Oregon.  Tr. 626-28.

Plaintiff testified that she drinks "periodically" but that she does not "drink like an alcoholic."  Tr. 628.  Plaintiff admitted that she had used methamphetamine during periods when she was able to work.  Tr. 628-29.  She denied experiencing symptoms of mania while using methamphetamine, but acknowledged that sometimes after finishing a "meth run," she does not feel like getting out of bed for days at a time, though she also feels this way when she is clean.  Tr. 629-30.

III.  Lay Testimony

On July 26, 2004, plaintiff's friend, Anthony Dominguez, completed a Third Party Function Report.  Tr. 88-96.  He noted that on a typical day, plaintiff helps with domestic chores at her mom's house, goes on jogs, walks the dog, visits, and works out frequently.  Tr. 88.  She used to be able to do "everything," but had lost the ability to "work and grow in today's world," and could not provide for herself.  Tr. 89.  Plaintiff has no difficulty preparing meals, completing household chores or yard work, goes outside daily, can handle a bank account, and can go shopping by herself.  Tr. 90-91.  She was limited in her daily activities and ability to pursue her hobbies and interests primarily because of lack of income.  Tr. 90-92.  He did not observe any problems with getting along with others.  Tr. 92-93.  He noted that she has difficulty standing, completing tasks, and concentrating, because "she's overwhelmed and has never had to deal with life on these

29 - FINDINGS & RECOMMENDATION

terms." Tr. 93. She had no problems walking long distances. Tr. 93.

On February 17, 2005, plaintiff's mother, Nyla Brignell, completed an Alcohol and Drug Use Questionnaire. Tr. 137-38. She stated that plaintiff had been clean and sober for 2 years and that her longest period of sobriety was 12 years. Tr. 137. She also noted that there was a history of mental illness in their family and plaintiff had developed PTSD because of recent traumatic life experiences. Tr. 138.

IV.  VE Testimony

At the hearing, the ALJ posed two hypotheticals to the VE in order to solicit testimony about what jobs plaintiff could perform, given her RFC. In the first hypothetical, the ALJ asked the VE to consider an individual the same age as plaintiff, with her same educational background, work experience, and who had "no specific exertional limitations, but would work best at a job that had a set routine, only casual co-worker interaction, and no frequent direct public contact." Tr. 631-32. In response, the VE testified that such a person could perform plaintiff's past work of landscaper or janitor, but not cocktail waitress. Tr. 632. The VE testified that such a person could also work as a products assembler, produce sorter, or janitor, all of which existed in significant numbers in the economy. Id. The ALJ then asked whether the same hypothetical individual, with the added limitation that the person would miss two or more days a month more than the employer would allow due to a variety of limitations related to concentration and mood. Tr. 633. The VE indicated that this additional limitation would preclude any competitive employment. Id.

30 - FINDINGS & RECOMMENDATION

THE ALJ'S DECISION

1        THE ALJ'S DECISION

2  The ALJ found that plaintiff met the insured status

3 requirements of the Social Security Act through December 31, 2007.

4 Tr. 12, 14.  The ALJ found that even though plaintiff worked part-

5 time after her alleged onset date, her earnings did not rise to the

6 level of substantial gainful activity.  Tr. 14. He found that

7 plaintiff's anxiety disorder and substance addiction disorder in

8 periodic remission are severe impairments but did not meet or

9 equal, either singly or in combination, a listed impairment.  Tr.

10 14-15.

11  The ALJ determined that plaintiff has the RFC to "perform a

12 full range of work at all exertional levels but with the following

13 nonexertional limitations: she is limited to work with a set

14 routine and only casual coworker interaction.  She is precluded

15 from direct public contact." Tr. 16.  In forming this RFC, the ALJ

16 found plaintiff's testimony regarding the intensity, persistence,

17 and limiting effects of her symptoms not fully credible.  Tr. 17.

18 In rejecting plaintiff's account of the severity of her

19 impairments, the ALJ noted that the record is replete with examples

20 of inconsistences in plaintiff's reports of drug use.  Tr. 17-18.

21 The ALJ further remarked that the treatment records indicate

22 improved functioning during abstinence from drugs.  Id.

23  The ALJ also rejected a January 2005 assessment made by one of

24 plaintiff's treating counselors, Nicole Gulick, M.A., wherein she

25 noted that plaintiff experienced paranoia that kept her isolated

26 for days at a time, that she exhibited pressured speech, lack of

27 concentration, and disorganization, she was easily distracted and

28 became paranoid when working and only recently was able to return

31 - FINDINGS & RECOMMENDATION

1  to limited on-call jobs. Tr. 17-18. The ALJ rejected this opinion

2  because Gulick is not an acceptable medical source and her report

3  is inconsistent with the counseling records. Tr. 18. The ALJ

4  found the lay witness testimony of one of plaintiff's friends

5  generally credible, but found the testimony of plaintiff's mother

6  inconsistent with the treatment record.    Tr. 18.

7      Based on plaintiff's RFC, the ALJ determined that plaintiff

8  could not perform her past relevant work, but that she could still

9  perform jobs existing in significant numbers in the national

10  economy. Tr. 19-20. Relying on the Medical-Vocational Guidelines

11  and VE testimony, the ALJ found that plaintiff could perform the

12  jobs of small products assembler, produce sorter, and janitor,

13  which exist in significant numbers in the economy.    Tr. 20.

14  Accordingly, the ALJ found plaintiff not disabled.   Id.

15             STANDARD OF REVIEW & SEQUENTIAL EVALUATION

16      A claimant is disabled if unable to "engage in any substantial

17  gainful activity by reason of any medically determinable physical

18  or mental impairment which . . . has lasted or can be expected to

19  last for a continuous period of not less than 12 months[.]"   42

20  U.S.C. § 423(d)(1)(A). Disability claims are evaluated according

21  to a five-step procedure. 20 C.F.R. §§ 404.1520, 416.920. The

22  claimant bears the burden of proving disability at the first four

23  steps in the process. Swenson v. Sullivan, 876 F.2d 683, 687 (9th

24  Cir. 1989). First, the Commissioner determines whether a claimant

25  is engaged in "substantial gainful activity." If so, the claimant

26  is not disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20

27  C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner

28  determines whether the claimant has a "medically severe impairment

32 - FINDINGS & RECOMMENDATION

1  or combination of impairments." <u>Yuckert</u>, 482 U.S. at 140-41; <u>see</u>
2  20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not
3  disabled.  <u>Id</u>.

4       In step three, the Commissioner determines whether the
5  impairment meets or equals "one of a number of listed impairments
6  that the [Commissioner] acknowledges are so severe as to preclude
7  substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 141; <u>see</u> 20
8  C.F.R. §§ 404.1520(d), 416.920(d).  If so, the claimant is
9  conclusively presumed disabled; if not, the Commissioner proceeds
10 to step four.  <u>Yuckert</u>, 482 U.S. at 141.

11      In step four the Commissioner determines whether the claimant
12 can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e),
13 416.920(e).  If the claimant can, he is not disabled.  <u>Id</u>.  If he
14 cannot perform past relevant work, the burden shifts to the
15 Commissioner.  In step five, the Commissioner must establish that
16 the claimant can perform other work.  <u>Yuckert</u>, 482 U.S. at 141-42;
17 <u>see</u> 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  If the
18 Commissioner meets its burden and proves that the claimant is able
19 to perform other work which exists in the national economy, he is
20 not disabled.  20 C.F.R. §§ 404.1566, 416.966.

21      The court may set aside the Commissioner's denial of benefits
22 only when the Commissioner's findings are based on legal error or
23 are not supported by substantial evidence in the record as a whole.
24 <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991).
25 Substantial evidence means "more than a mere scintilla," but "less
26 than a preponderance."  <u>Id</u>.  It means such relevant evidence as a
27 reasonable mind might accept as adequate to support a conclusion.
28 <u>Id</u>.

33 - FINDINGS & RECOMMENDATION

DISCUSSION

1   Plaintiff asserts that the ALJ's decision should be reversed
2   and remanded for an award of benefits because it is not supported
3   by substantial evidence and contains errors of law.  In particular,
4   plaintiff contends that the ALJ erred by failing to perform a
5   proper drug and alcohol abuse (DAA) analysis and improperly
6   rejecting the opinion of plaintiff's treating counselor.  Plaintiff
7   also summarily contends that based on these errors, the ALJ's
8   evaluation of the plaintiff's credibility, the lay witness
9   statements, and the vocational analysis was also flawed, and that
10  if such evidence is credited, she is entitled to remand for payment
11  of benefits.

12  I.  Drug and Alcohol Abuse Analysis

13  Plaintiff argues that the ALJ failed to properly assess the
14  significance of plaintiff's drug abuse under 42 U.S.C. §§
15  423(d)(2)(C), 1382c(a)(3)(J) and 20 C.F.R. §§ 404.1535, 416.935(b).
16  The Commissioner contends that the ALJ properly took into account
17  plaintiff's substance abuse, finding that she was able to work,
18  with or without her substance abuse problems.

19  Under the Social Security Act, a claimant "shall not be
20  considered to be disabled . . . if alcoholism or drug addiction
21  would . . . be a contributing factor material to the Commissioner's
22  determination that the individual is disabled."  42 U.S.C. §§
23  423(d)(2)(C), 1382c(a)(3)(J).  The proper analysis in cases where
24  the claimant has alcohol or drug addition issues, is to first
25  conduct the five-step sequential evaluation "without separating out
26  the impact of alcoholism or drug addiction."  Bustamante v.
27  Massanari, 262 F.3d 949, 955 (9th Cir. 2001).  If the ALJ

34 - FINDINGS & RECOMMENDATION

1 determines that the claimant is not disabled, the claimant is not
2 entitled to benefits and no further analysis is necessary. Id.
3 However, if after considering the impact of the addiction, the ALJ
4 determines that the claimant is disabled, then the ALJ must then
5 follow the five-step sequential evaluation process to determine if
6 the claimant "would still be found disabled if he or she stopped
7 using alcohol or drugs." Id.

8      This analysis requires the ALJ to determine which of the
9 claimant's disabling limitations would remain if the claimant
10 stopped using drugs or alcohol.  See 20 C.F.R. §§ 404.1535(b),
11 416.935(b).  If the remaining limitations would still be disabling,
12 then the claimant's drug addiction or alcoholism is not a
13 contributing factor material to her disability. Id.  If the
14 remaining limitations would not be disabling, then the claimant's
15 substance abuse is material and benefits must be denied. Id.; see
16 Parra v. Astrue, 481 F.3d 742, 747 (9th Cir. 2007), cert. denied,
17 128 U.S. 1068 (2008).  The claimant has the burden of proving that
18 drug or alcohol addiction is not a contributing factor material to
19 her disability.  Parra, 481 F.3d at 748.

20      Plaintiff contends that the ALJ erred because he performed
21 only one five-step analysis, instead of two separate analyses.
22 However, plaintiff seems to misunderstand the critical point that
23 the DAA analysis is only performed if the ALJ first finds that the
24 claimant has a disability.  20 C.F.R. §§ 404.1535(a), 416.935(a).
25 In Bustamante, the court made clear that "an ALJ should not proceed
26 with the analysis under §§ 404.1535 or 416.935 if he has not yet
27 found the claimant to be disabled under the five-step inquiry." 262
28 F.3d at 955(emphasis added).  "[A]n ALJ must first conduct the

35 - FINDINGS & RECOMMENDATION

1 five-step inquiry without separating out the impact of [substance
2 abuse].  If the ALJ finds that the claimant is *not disabled* under
3 the five-step inquiry, then the claimant is not entitled to
4 benefits and *there is no need to proceed* with the analysis[.]" <u>Id</u>.
5 (emphasis added).

6     Here, the ALJ conducted the initial five-step inquiry without
7 factoring out the impact of plaintiff's drug and alcohol use.  The
8 ALJ concluded that plaintiff was not disabled and was able to work,
9 even with her substance abuse problems.  Consequently, the ALJ was
10 not required to consider the effect of plaintiff's substance abuse
11 on her disability.  The ALJ included "substance addiction disorder
12 in periodic remission" as one of plaintiff's severe impairments,
13 and found that when plaintiff is using methamphetamine, she has
14 only mild difficulties with regard to concentration, persistence,
15 or pace, characterized by "tangential thought processes and
16 distractability."  Tr. 14-15.  The ALJ went on to note that when
17 plaintiff is not using drugs, the treatment records reflect good
18 concentration.  Tr. 15.

19     The ALJ made note of several periods where plaintiff's
20 functioning improved during periods of abstinence from drugs.  Tr.
21 17-19.  Despite the difficulty in determining precisely what
22 periods of time plaintiff was sober,[2] the record indicates that

23

24     [2]  The ALJ noted that plaintiff was not always forthcoming
25 regarding the extent and frequency of her drug use.  Tr. 17-18.
   While there are indeed many conflicting statements regarding when
26 plaintiff used and how long she had been sober, the record
   indicates that plaintiff did not report any drug use beginning in
27 early 2004 (Tr. 187-88, 277, 284, 288, 297) and lasting until the
   spring of 2007 (Tr. 505, 539), though some providers speculated
28 that she may have been using during this time (Tr. 256, 584).

36 - FINDINGS & RECOMMENDATION

during times plaintiff did not report any drug use, she was able to make it to most of her counseling sessions, travel, and even work part time.  See Tr. 232, 234, 261, 337.

The ALJ also questioned plaintiff at length during the hearing in order to confirm that plaintiff was able to work during periods of methamphetamine use.  Tr. 628.  These findings led the ALJ to conclude that plaintiff was not disabled, even during periods of drug use, when plaintiff's functioning is less than during periods of sobriety.  Having made such a finding, the ALJ was not required to conduct an additional five-step inquiry to determine the effect of plaintiff's drug use on her disability.  Reversal or remand is not warranted on this basis.

II.  Rejection of Treating Counselor's Opinion

Plaintiff contends that the ALJ improperly rejected the January 2005 opinion of her treating counselor, Nicole Gulick, M.A. The Commissioner responds that the ALJ provided legally sufficient reasons for giving no weight to this opinion.

Only "acceptable medical sources" can give medical opinions to establish the existence of a medically determinable impairment.  20 C.F.R. §§ 404.1513(a) & 416.913(a), 404.1527(a)(2) & 416.927(a)(2). "Acceptable medical sources" include licensed physicians and licensed psychologists, but not licensed clinical social workers and therapists and counselors.  20 C.F.R. §§ 404.1513 & 416.913. While information from these "other sources" cannot establish the existence of a medically determinable impairment, they "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  SSR 06-03p, 2006 WL 2329939, *2 (Aug. 9, 2006).  Consequently, in order to reject the

37 - FINDINGS & RECOMMENDATION

1  testimony of a treating counselor that is not an accepted medical
2  source, the ALJ must give germane reasons for the rejection. Stout
3  v. Comm'r, 454 F.3d 1050, 1053 (9th Cir. 2006).

4      The ALJ rejected a January 21, 2005, assessment made by
5  plaintiff's treating counselor at the time, Nicole Gulick, M.A.,
6  wherein she noted that plaintiff experienced paranoia that kept her
7  isolated for days at a time, that she exhibited pressured speech,
8  lack of concentration, and disorganization, that she was easily
9  distracted and became paranoid when working, and only recently was
10 able to return to limited on-call jobs. Tr. 17-18. The ALJ gave
11 this assessment "no weight" because Gulick is "not an acceptable
12 medical source," and "her report is inconsistent with the
13 counseling records reflecting improved mood, good concentration,
14 and work activity which she was enjoying," and because plaintiff
15 was not forthcoming regarding the extent of her drug use. Tr. 18.

16     To the extent that the ALJ rejected Gulick's opinion because
17 of her status as a non-acceptable medical source, this reason is
18 not germane because the ALJ could reject any other non-acceptable
19 medical source for the same reason.

20     The ALJ rejected Gulick's January 2005 opinion because he
21 concluded that it was inconsistent with the treatment records which
22 reflected increased function and satisfaction with her work.
23 During the months leading up to Gulick's January 2005 assessment,
24 the treatment records indicate that plaintiff was experiencing
25 paranoia, had missed a couple of days of work, and exhibited
26 pressured, rapid speech, and lack of concentration. See Tr. 244-
27 45, 253, 255-57, 259-61. However, by December 3, 2004, plaintiff's
28 speech was not as rapid, her affect calm, and she reported that she

38 - FINDINGS & RECOMMENDATION

was doing better.  Tr. 251.  In late December 2004, plaintiff's medication management counselor added Abilify to plaintiff's medication regime, and plaintiff began to stabilize.  Tr. 243, 238-39, 237.  On January 19, 2005, just two days before Gulick's assessment, plaintiff reported that she was happy with her current medication regime, she was enjoying her on-call landscaping job at Well Springs, and Gulick herself observed that plaintiff's speech was not as rapid and she was not reporting any paranoid thoughts. Tr. 237-39.

About a month later, on February 18, 2005, plaintiff's medication management counselor, Hippe, observed that plaintiff's "function status had improved," she was working part time, had a stable boyfriend, and denied any negative medication side effects. Tr. 234.  Gulick made similar observations in March 2005, and the record reflects that for most of 2005 plaintiff continued to stabilize.  Tr. 232, 227-30, 340.  Gulick stopped being plaintiff's treating counselor in late January 2006.  Tr. 331-35.  The treatment record is replete with examples of plaintiff experiencing an increase in some of her symptoms, followed closely by a period of stabilization.  See Tr. 302-08, 342-45.

Even plaintiff herself noted that while she was working at Well Springs, she had to take a couple of days off for mental health issues, but that she mostly was able to "work through it." Tr. 608-09.  One of plaintiff's subsequent treating counselors noted in March 2007 that plaintiff's "presentation has improved significantly over [the] years on very few medications."  Tr. 347. Consequently, substantial evidence supports the ALJ's characterization that Gulick's January 2005 opinion was not

39 - FINDINGS & RECOMMENDATION

1  consistent with the treatment record as a whole.

2      The ALJ also rejected Gulick's opinion because plaintiff was
3  not always forthcoming regarding the extent of her drug use.
4  Inconsistencies in claimant testimony is a legitimate reason to
5  discredit the claimant's testimony. Smolen v. Chater, 80 F.3d
6  1273, 1284 (9th Cir. 1996). Even opinions by acceptable medical
7  sources can be rejected if they rely upon the subjective complaints
8  of a properly discredited claimant. See Morgan v. Apfel, 169 F.3d
9  595, 602 (9th Cir. 1999). Plaintiff's inconsistencies with regard
10 to her drug use are discussed more fully below.

11     The ALJ gave two germane reasons to reject Gulick's testimony
12 that are supported by substantial evidence in the record.
13 Consequently, the ALJ's rejection of Gulick's 2005 opinion was not
14 in error.

15 III.  Other Errors

16     Plaintiff briefly raises other assignments of error, namely
17 that the ALJ's vocational hypothetical and conclusions regarding
18 plaintiff's credibility and the lay witness testimony were flawed.
19 Plaintiff does not brief these issues with any specificity,
20 alleging only that because the ALJ failed to conduct a proper DAA
21 analysis and improperly rejected Gulick's January 2005 opinion, the
22 ALJ's conclusions on these other matters "are fatally flawed."
23 Having found no error in either of these findings, reversal or
24 remand based on the impact of these findings on any other alleged
25 error, is unwarranted. However, in the interest of providing
26 plaintiff a complete review, the court will briefly discuss each of
27 these other alleged assignments of error.

28 / / /

A.  Plaintiff's Credibility

Plaintiff makes some mention that the ALJ improperly rejected her testimony, though she does not otherwise elaborate on what portions of her testimony should be credited.

When a claimant's medical record establishes the presence of a "medically determinable impairment" that "could reasonably be expected to produce the [claimant's alleged] pain or other symptoms," the ALJ must evaluate the claimant's credibility in describing the extent of those symptoms.  20 C.F.R. §§ 404.1529 416.929.  In the event the ALJ determines that the claimant's report is not credible, such determination must be made "with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002) (citing Bunnell v. Sullivan, 947 F.2d 341, 345-46 (9th Cir. 1991) (en banc)).  Unless the record has affirmative evidence of malingering, the ALJ must offer specific, clear and convincing reasons for rejecting the claimant's testimony about the severity of her symptoms.  Carmickle v. Comm'r, 533 F.3d 1155, 1160 (9th Cir. 2008).

When making a credibility evaluation, the ALJ may consider the claimant's daily activities, work record, and observations of physicians and third parties in a position to have personal knowledge about the claimant's functional limitations.  Smolen, 80 F.3d at 1284.  In addition, the ALJ may rely on:

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately

1               explained failure to seek treatment or to follow a
             prescribed course of treatment; and (3) the
2               claimant's daily activities.

3  Id.; see also SSR 96-7p; 1996 WL 374186 (July 2, 1996).

4       A finding that a claimant lacks credibility cannot be premised

5  solely on a lack of medical support for the severity of

6  impairments. See Lester v. Chater, 81 F.3d 821, 834 (9th Cir.

7  1995). However, a credibility finding supported by substantial

8  evidence in the record cannot be disturbed. Thomas, 278 F.3d at

9  959 (citing Morgan, 169 F.3d at 600).

10       Here, the ALJ concluded that plaintiff's testimony concerning

11  the intensity, persistence, and limiting effects of her symptoms

12  was not entirely credible. Tr. 17. Since there is no evidence of

13  malingering, the ALJ was required provide clear and convincing

14  reasons to reject plaintiff's testimony regarding the severity of

15  her symptoms.

16       In discrediting plaintiff's testimony, the ALJ noted that the

17  treatment record reflects inconsistences in plaintiff's reports of

18  drug use, and do not fully support her account of her disabling

19  symptoms. Tr. 17-18. Plaintiff's treatment records reflect

20  inconsistent reports of when plaintiff was using drugs. For

21  example, in two treatment notes from April 2004, plaintiff

22  indicates that she had last used methamphetamine three months

23  earlier (Tr. 294), and then just a few weeks later, that she had

24  last used one month earlier (Tr. 288). There are also instances

25  where plaintiff acknowledges using regularly during 2002-2003 (Tr.

26  188), but other places where she claims to have been sober since

27  the late 1990s (Tr. 294, 462). The records also reflect that

28  plaintiff did not always reveal to her treatment providers that she

was using drugs. Specifically, in August 2007, plaintiff acknowledged for the first time that she has been using methamphetamine daily for the previous four months, despite seeing her treating counselors on a regular basis during that period. Tr. 492. At the hearing in early December 2007, plaintiff testified that she had used just days before the hearing, but had otherwise been sober for almost eight years (Tr. 624-25). This testimony is called into question by the treatment records which indicate that she tested positive for methamphetamine in July 2003 (Tr. 183), acknowledged using in early 2004 (Tr. 187-188, 277, 284, 294), had recently completed inpatient drug treatment in August 2007 (Tr. 419-525), and had relapsed at least twice in the few months between leaving treatment and the hearing (Tr. 402, 406-07, 563).

The ALJ also noted that plaintiff has increased functioning when she is not using methamphetamine. Tr. 17-18. The record supports this, as discussed above regarding the ALJ's DAA analysis. Additionally, several of plaintiff's providers opined that at least some of her delusions and other psychotic symptoms might be caused by plaintiff's methamphetamine use. See Tr. 186 (Dr. Sacks), 399 (therapist Toering), 541 (medication counselor Hahn).

The ALJ provided clear and convincing reasons supported by substantial evidence for discrediting plaintiff's testimony. Consequently, there is no basis for disturbing the ALJ's credibility finding.

B. Lay Witness Testimony

Plaintiff argues that the ALJ improperly rejected the lay witness testimony. Lay testimony of witnesses about their own observations regarding the claimant's impairments must be

43 - FINDINGS & RECOMMENDATION

1  considered by the ALJ.  Smolen, 80 F.3d at 1288.  Testimony from
2  lay witnesses who see the claimant on a regular basis is of
3  particular value, because they can often ascertain whether the
4  claimant is malingering or truly suffering.  Dodrill v. Shalala, 12
5  F.3d 915, 919 (9th Cir. 1993).  If an ALJ chooses to discount the
6  statements of lay witnesses, the ALJ must provide "germane reasons
7  to each witness for doing so."  Lewis v. Apfel, 236 F.3d 503, 511
8  (9th Cir. 2001) (citation omitted).

9       Here, the ALJ evaluated the testimony of two lay witnesses,
10 plaintiff's friend, Anthony Dominguez, and plaintiff's mother, Nyla
11 Brignell.  Tr. 18.  The ALJ found Dominguez's July 2004 report
12 "generally credible," and consistent with the ALJ's conclusion that
13 while plaintiff has some difficulties with concentration and
14 completing tasks, she generally lives an active lifestyle and has
15 the capacity to work with a set routine.  Id.  The ALJ rejected
16 Dominguez's testimony that plaintiff has difficulty standing, since
17 there is no support for this in the record.  Id.  Dominguez himself
18 notes plaintiff had no problems taking long walks, which one
19 obviously does in the standing position.  While plaintiff sought
20 treatment for varicose vein pain in 2000, by 2002, she was not
21 reporting any issues with her legs.  See Tr. 362, 365, 370, 372-74.
22 The record reveals no other physical limitations whatsoever, much
23 less any that might impact plaintiff's ability to stand.

24      The ALJ rejected plaintiff's mother's February 2005 report
25 that plaintiff had been clean and sober for two years because this
26 is inconsistent with the treatment record.  Id.  Specifically,
27 plaintiff tested positive for methamphetamine in July 2003 (Tr.
28 183) and in April 2004 plaintiff acknowledged that she had used

44 - FINDINGS & RECOMMENDATION

1  methamphetamine within the past four months (Tr. 294).

2       Consequently, to the extent that the ALJ rejected the lay
3  witness testimony, the ALJ provided germane reasons, supported by
4  the record, for doing so.  Reversal or remand on this basis is not
5  warranted.

6       C.  Step Five

7       Plaintiff also makes a passing challenge the ALJ's step five
8  finding, presumably on the basis that the ALJ's hypothetical failed
9  to fully account for her limitations.

10      At step five, the Commissioner must show that there are a
11 significant number of jobs in the national economy that the
12 claimant can perform, given his or her RFC.  Tackett v. Apfel, 180
13 F.3d 1094, 1100-01 (9th Cir. 1999); Andrews v. Shalala, 53 F.3d
14 1035, 1043 (9th Cir. 1995).  The Commissioner can satisfy this
15 burden by eliciting the testimony of a VE regarding what jobs the
16 claimant would be able to perform, given his or her RFC.  Id.  An
17 ALJ must propose a hypothetical that sets forth all the reliable
18 limitations and restrictions of a claimant that are supported by
19 substantial evidence.  Roberts v. Shalala, 66 F.3d 179, 184 (9th
20 Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  The hypothetical
21 must be "accurate, detailed, and supported by the medical record."
22 Tackett, 180 F.3d at 1101.  "If a hypothetical fails to reflect
23 each of the claimant's limitations supported by 'substantial
24 evidence,' the expert's answer has no evidentiary value."
25 Osenbrock v. Apfel, 240 F.3d 1157, 1167 (9th Cir. 2001) (citing
26 Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984)).

27      For the reasons discussed above, plaintiff's challenges to the
28 ALJ's findings cannot be sustained.  The ALJ elicited testimony

45 - FINDINGS & RECOMMENDATION

from the VE that incorporated all the limitations set forth in the RFC and supported by the record as a whole. In response, the VE testified that a person with plaintiff's age, education, work experience, and RFC could work as a small products assembler, produce sorter, or janitor, leading the ALJ to conclude that plaintiff could perform significant numbers of jobs in the national economy, and therefore, was not disabled. The ALJ was not required to incorporate any additional limitations that he found unsupported by the record. Osenbrock, 240 F.3d at 1163-65. The hypothetical presented to the VE set forth plaintiff's reliable limitations and restrictions supported by substantial evidence. Consequently, the ALJ's step five finding is not a basis for reversal or remand.

CONCLUSION

The Commissioner's decision should be affirmed.

SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due January 30, 2012. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due February 16, 2012. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this 12th day of January, 2012.


/s/ Dennis J. Hubel

_____
Dennis James Hubel
United States Magistrate Judge

46 - FINDINGS & RECOMMENDATION